# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEVEN GURNEY-GOLDMAN, as Executor of the Estate of Allan H. Goldman, and AMY GOLDMAN FOWLER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-1124-JTL |
| JANE H. GOLDMAN, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| SG WINDSOR, LLC, a Delaware Limited Liability Company, | ) ) ) | |
| Nominal Party. | ) ) | |

## POST-TRIAL OPINION

Date Submitted: July 9, 2024
Date Decided: July 12, 2024

Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; S. Michael Blochberger, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael B. Carlinsky, David E. Myre, Ryan A. Rakower, Caitlin E. Jokubaitis, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Plaintiff Steven Gurney-Goldman, as Executor of the Estate of Allan H. Goldman.*

Paul J. Loughman, Robert M. Vrana, Michael A. Laukaitis II, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Mitchell Geller, Jasmine S. Chean, HOLLAND & KNIGHT LLP, New York, New York; *Attorneys for Plaintiff Amy Goldman Fowler.*

Rudolf Koch, Daniel E. Kaprow, Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jason Cyrulnik, Paul Fattaruso, CYRULNIK FATTARUSO LLP, New York, New York; *Attorneys for Defendant Jane H. Goldman.*

**LASTER, V.C.**

Four siblings owned equal, 25% shares in a New York-based real estate empire. From 1987 until 2022, two of the siblings managed the business. The other two pursued other interests.

Today, literally hundreds of entities play roles in the empire. One of the entities is a Delaware limited liability company ("LLC") that lacks a written LLC agreement. From 2002 until 2022, the four siblings each owned a 25% member interest in the LLC.

In 2022, one of the siblings who managed the business died. His 25% interest passed to his estate. In this action, his son seeks a declaration that he can exercise the governance rights associated with his deceased father's member interest. One of the two siblings who has not historically been involved in managing the business supports his efforts. The sibling who currently oversees the management of the family's real estate empire opposes their efforts. So does the other sibling who has not been involved in management.

The parties seek declarations regarding the governance of the Delaware LLC. This decision holds that (i) the LLC is member-managed, (ii) the estate does not own a member interest in the LLC but rather only holds an assignee interest, and (iii) the executor of the estate can exercise the member rights associated with the LLC interest for the purpose of administering and settling the estate. The court will not issue any injunctive relief.

## I.  FACTUAL BACKGROUND

The court held a one-day trial where three witnesses testified live. The parties introduced 234 exhibits, including six deposition transcripts.[1]

The plaintiffs bore the burden of proving their claims by a preponderance of the evidence. The defendant bore the burden of proving her affirmative defenses by a preponderance of the evidence. The court has evaluated the credibility of witnesses and weighed the factual record. The record supports the following findings of fact.

### A.  The Goldman Family Real Estate Business

From humble beginnings, Sol Goldman[2] built one of the largest private real estate empires in New York City. He was a Brooklyn grocer's son who started buying foreclosed properties in 1933 at age 16. When he died in 1987, his real estate portfolio encompassed some thirteen million square feet of commercial and residential space in Manhattan. His estate was valued at $1 billion—the largest to enter New York probate.

Sol left behind his spouse, Lillian Goldman. He also left behind four children: Jane H. Goldman, Diane Goldman Kemper, Amy Goldman Fowler, and Allan H. Goldman.

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" reference trial exhibits.

[2] For simplicity, this decision refers to the Goldman family members and Louisa Little by their first names without implying familiarity or intending disrespect.

For many years before Sol's death, Jane worked side-by-side with her father as he managed the family business. In his will, Sol chose Jane and Allan to serve as co-executors, along with a third executor whom he authorized Jane to appoint. Jane selected a longtime employee, Louisa Little. Amy testified that her father spoke with her about being a co-executor with Jane, but she recommended that he select Allan.

After Sol's death, Jane, Allan, and Louisa performed their duties as co-executors, which put them in the position of making determinations about how to handle Sol's many properties. Their service as co-executors morphed into ongoing roles managing the Goldman family business.

No one objected to Jane, Allan, and Louisa managing the business. Amy and Diane were content with the arrangement and acceded to it. Both pursued other interests.

## B.    The Dispute Between The Siblings And Lillian

After Sol's death, disputes arose between the siblings and Lillian over the distribution of his estate. The siblings became concerned that if Lillian received significant assets, she might divide them among her children unequally. In 1988, the siblings addressed that issue by executing a one-page agreement in which they committed "to share equally among us, if we are living or our descendants if we are not, any gift or bequest or benefits we may receive from mother, either during her lifetime, or by her will."[3]

---

[3] JX 2 (the "Sharing Agreement").

Lillian and the siblings ended up settling their disputes. Lillian received one-third of Sol's estate, and the siblings received equal shares of the other two-thirds.

Neither the family dispute nor the settlement had any meaningful effect on the day-to-day operation of the business. Jane, Allan, and Louisa were managing the entire real estate portfolio. After the settlement, Lillian continued to rely on them to manage her share.

Lillian died in August 2002. In her will, she named the four siblings as her executors. Twenty-two years later, Lillian's estate remains open and unsettled.

## C. The Legal Structure Of The Goldman Family Business

Sol ran his real estate empire as a sole proprietorship. After Sol's death, Jane, Allan, and Louisa turned to Simpson Thacher & Bartlett LLP, a major New York law firm, to create the legal structure for their sprawling intersts.

Simpson Thacher created many entities to hold individual real estate properties, hold the interests in those entities, and for other purposes. Today, the Goldman family business involves literally hundreds of entities. The entities that hold specific Goldman properties roll up to three parent entities. One is Sol Goldman Investments, LLC, which holds the properties the siblings inherited from Sol. The others are Lighthouse Properties, LLC and Plaza Circle LLC, which hold the properties that Lillian inherited from Sol and that became part of her estate. For simplicity, this decision calls these entities the "Property Owners."

The entity at the heart of the Goldman empire is Solil Management LLC, organized on June 11, 2001. Its name is a portmanteau of the first syllables of Sol

4

and Lillian. That entity provides property-management services to the Goldman family's properties. For simplicity, this decision calls it the "Property Manager."

The Property Owners pay fees to the Property Manager for its services. Those services would be familiar to anyone who has hired a property manager to manage real estate, albeit on a grander scale. They consist of collecting rents, handling maintenance, monitoring the timing of lease renewals, managing lease renewals, and similar tasks.

Despite its nominally junior position as a service provider, the Property Manager is the only Goldman-affiliated entity with any employees. Technically, the Property Manager does not make major business decisions, such as whether to lease a given property or take on debt; the Property Owners make those calls. But because the Goldman family owns both the Property Manager and the Property Owners, the same people make the decisions irrespective of the entity through which they act. The record suggests that the Goldman family has not always observed entity formalities by maintaining a strict division between the Property Manager and the Property Owners. Who does what in what capacity seems fluid.

The Property Manager is a New York LLC. Despite its significance to the Goldman family business, it does not have an executed written operating agreement.

The Property Manager's two members are SG Windsor, LLC, a Delaware LLC, and SG Empire, a New York LLC. Until 2022, each of the four siblings owned a 25% member interest in SG Windsor. The same appears true for SG Empire.

SG Windsor and SG Empire are holding companies. Neither has any assets or operations other than owning their member interests in the Property Manager.

Simpson Thacher created SG Windsor in July 2002 by filing a certificate of formation with the Delaware Secretary of State. The entity's original name was Mill Neck L.L.C. ("Mill Neck"), and the certificate identified Lillian as the sole member. For reasons unknown, the LLC changed its name to SG Windsor on September 6, 2012. The entity does not have a written LLC agreement.

After Lillian died in August 2002, Jane, Diane, Amy, and Allan treated themselves as equal members of SG Windsor, with each receiving a 25% member interest. There are no documents establishing the transfer of interests in SG Windsor to the siblings. No one remembers how that was accomplished. It just happened.

As long as Jane, Allan, and Louisa were operating the family business, SG Windsor and SG Empire played minimal roles. The entities filed annual tax returns, and they made distributions to their members. There was no reason for SG Windsor or SG Empire to do more. In fact, Amy had never heard of SG Windsor until a year or so ago.[4]

## D.    Thirty-Five Years Of Unified Management

For thirty-five years after Sol's death in 1987, Jane, Allan, and Louisa managed the Goldman real estate empire. During this time, Jane and Allan were the key decision-makers. Starting in the early 2000s, persistent health issues forced

---

[4] Amy Dep. at 211.

Allan to work remotely, so he and Jane would talk regularly by phone. Jane could not recall ever disagreeing with Allan about a management decision. Louisa implemented their decisions and handled the day-to-day management of the Goldman properties. As Jane explained at trial, Louisa was in charge of things like boilers, gas, and oil.[5]

Although Jane and Allan were the principal decision-makers, they did not exercise plenary authority. A general understanding existed among the siblings that Jane and Allan would consult with Amy and Diane on major issues. One example involved how to handle a prime development site on 60th Street between Park and Madison Avenues. Another involved the Property Manager potentially applying for a loan under the Covid-19-era Paycheck Protection Program. Amy and Jane originally favored applying for the loan, and the Property Manager's general counsel sent the siblings an email asking that they approve the necessary filing. The draft application listed each of the four siblings as a "manager" of the Property Manager and had spaces for their signatures.[6] The application did not identify Louisa as a manager and did not call for her signature. Nor did the application only identify Jane and Allan as managers. After further discussion, the four siblings reached agreement against applying. The matter was dropped.

Allan's son, Steven Gurney-Goldman, worked for the family business at the Property Manager's main office between 2013 and 2020. During that time, he

---

[5] Jane Tr. 91.

[6] JX 81 at '560.

7

observed Jane and Allan acting as the principal managers for the Goldman enterprise. He also observed Louisa handling the quotidian details. And he observed that Amy and Diane were not meaningfully involved.

## E.    Allan Dies.

Allan died on January 15, 2022. His will appointed Steven as executor of his estate.

Allan's will sought to empower Steven with the authority necessary to administer and settle his estate. In a subsection titled "Authority to Deal with Partnerships or Other Entities," the will "grant[ed] to the Executor[] the fullest powers and authority to settle and liquidate" his "interest in any partnership or other entity forming part of [Allan's] estate."[7] In a provision titled "Authority to Continue Business," the will

> authorize[d] the Executor[] to continue for such period of time as they deem desirable the operation of any business in which [Allan] was engaged at the time of [his] death, whether alone, in a partnership, through a corporate form, or in any other manner, at the risk of [his] general estate and without any personal liability on its part, and in connection therewith:  to take part in the management of any such business and to fix or change the policy thereof[.][8]

The will specified that the executor would have the same management powers as Allan had with regard to any "rights and interests in real estate and in incorporated

---

[7] JX 67 at '128.

[8] *Id.* at '130.

8

or unincorporated real estate businesses or enterprises,"[9] including the right to "carry on, operate and manage such properties, businesses or enterprises."[10]

The sections of the will empowering Steven to act comported with an instrument Allan executed before his death. In that instrument, titled "Appointment of Successor Manager," Allan appointed Steven as successor manager of "each Goldman Family Entity with respect to which Allan H. Goldman has the right under the Governing Agreement of such Goldman Family Entity to appoint his successor as Manager . . . to act at such time as Allan H. Goldman ceases to act as Manager of such Goldman Family Entity."[11]  Steven accepted those appointments.

Steven has engaged in extensive efforts to settle his father's estate, but it remains open. At this point, the estate's principal assets comprise Allan's 25% share in the illiquid real estate holdings making up the Goldman family empire.

F.     The Redemption Dispute

After Allan's death, Jane saw herself as the lone remaining decision-maker for the family business. Steven, by contrast, hoped to take over his father's role and manage the business jointly with Jane. When Steven approached Jane about that possibility, she rebuffed him. She felt that Steven—like her own similarly aged son—was too young to take on a major decision-making role. Jane acknowledged that she

---

[9] *Id.* at '131.

[10] *Id.*

[11] JX 192 at '7304.

and Allan, when similarly callow, had taken on managerial roles after Sol's death, but necessity had forced the issue. Jane felt that because she remained at the helm, there was no reason to integrate the next generation so quickly. Steven did not like that answer, and his relationship with Jane came under strain.

Steven also felt that Jane was not sufficiently responsive to his requests for information to help him administer his father's estate. Although Steven acknowledges that he ultimately received the information he needed, he did not receive the level of cooperation he expected. Those interactions did not improve Steven and Jane's relationship.

In November and December 2022, Amy and Steven sought to exercise put rights they held under the operating agreement for one of the Property Managers. The operating agreement contains an appraisal mechanism to set the redemption price. Jane secured a third-party appraisal from a firm that she says Amy's lawyer had suggested. Based on the resulting appraisal, Jane offered to redeem 5% of each branches' equity for $91 million.

Amy and Steven viewed that price as facially inadequate, and they inferred that Jane must have provided information to the appraisal firm that would have supported such a low valuation. Jane denies this.

Steven met with Jane in an attempt to agree on a mutually acceptable price. Recollections of that meeting differ. Steven testified credibly that he encouraged Jane to settle because otherwise the dispute could result in litigation, which would be unpleasant and bring unwanted public attention to the family. That was a factually

true statement, but Jane interpreted Steven's comments as an attempt to blackmail her. Based on the record, Jane's reaction seems overblown. Regardless, Jane took umbrage at Steven's comments. Positions hardened.

## G.    The Litigation

In late 2022, Amy and Steven filed a lawsuit in New York state court against Jane and Diane. The 134-page complaint challenged the appraisal and redemption price, attacked Jane's management of SG Empire and the Property Manager, and raised various trust and estate disputes, largely related to Lillian's still unsettled estate.

In 2023, Amy and Steven filed this litigation. They seek a declaration that SG Windsor is a member-managed entity. They also seek a declaration that Allan's estate is a member of SG Windsor or, to the extent the estate is only an assignee, that Steven can exercise governance rights equivalent to those of a member in his capacity as the executor to Allan's estate. Based on those assertions they seek a ruling that SG Windsor can only act if members holding a majority of the LLC interest approve. With the member interest equally divided among four members, that would mean that Jane could not act unilaterally on behalf of SG Windsor. Any decision would require the agreement of at least three of the four Goldman family branches.

## II.    LEGAL ANALYSIS

The issues in this case consist primarily of requests for declaratory judgments. This decision addresses those first. Then it addresses Jane's affirmative defenses and the plaintiffs' request for injunctive relief.

11

## A. Whether SG Windsor In Member Managed

The plaintiffs seek a declaration that SG Windsor is a member-managed LLC. They proved that it is.

By default under the Delaware Limited Liability Company Act (the "LLC Act"), an LLC is member managed. The operative provision states:

> Unless otherwise provided in a limited liability company agreement, the management of a limited liability company shall be vested in its members in proportion to the then current percentage or other interest of members in the profits of the limited liability company owned by all of the members, the decision of members owning more than 50 percent of the said percentage or other interest in the profits controlling[.][12]

"To create a manager-managed structure, the LLC agreement must expressly vest authority in one or more managers."[13]

SG Windsor does not have a written LLC agreement. That means there is no written LLC agreement that expressly vests authority in any managers.

Jane responds that there is an implied agreement under which SG Windsor was a manager-managed entity with Jane, Allan, and Louisa acting as managers. The LLC Act defines the term "limited liability company agreement" to mean "any agreement . . . written, oral or implied, of the member or members as to the affairs of

---

[12] 6 *Del. C.* § 18-402.

[13] *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *19 (Del. Ch. July 19, 2019); *accord Phillips v. Hove*, 2011 WL 4404034, at *22 (Del. Ch. Sept. 22, 2011) ("If the LLC agreement does not name a manager or provide a procedure for designating a manager, then 'the management of a limited liability company shall be vested in its members . . . .'" (quoting 6 *Del. C*. § 18-402)).

12

a limited liability company and the conduct of its business."[14] By statute, therefore, an LLC agreement can be "oral or implied."[15]

"An implied agreement 'is one inferred from the conduct of the parties, though not expressed in words.'"[16] "Just as assent may be manifested by words, so intention to make a promise may be manifested in language or by implication from other circumstances."[17] Like any other contract an implied agreement requires "a meeting of minds . . . ."[18] To prove an implied agreement, the court must be able to infer "as a

---

[14] 8 *Del. C.* § 18-101(9).

[15] From the perspective of a court adjudicating LLC disputes, it would be nicer if the LLC Act required a written agreement to create a manager-managed entity. But as I understand it, maintaining the possibility of oral or implied agreements helps Delaware practitioners provide clients with favorable legal opinions on the due formation of LLCs and the validity of acts those LLCs have taken, particularly when an LLC has been operating for an extended period without a written LLC agreement. Permitting oral and implied agreements thus makes the lawyers' lives easier, even if it makes adjudication harder.

[16] *Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 3811237, at *10 (Del. Ch. Aug. 1, 2014) (quoting *Cap. Mgmt. Co. v. Brown*, 813 A.2d 1094, 1098 (Del. 2002)), *aff'd*, 115 A.3d 1215 (Del. 2015) (TABLE).

[17] *Id.* (quoting 1 *Williston on Contracts* § 1:5 (4th ed. 2014)).

[18] *Chase Manhattan Bank v. Iridium Afr. Corp.*, 239 F. Supp. 2d 402, 408 (D. Del. 2002) (citing *Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996)), *report and recommendation adopted*, 294 F. Supp. 2d 634 (D. Del. 2003).

fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding."[19] The "failure to object may be treated as acceptance."[20]

As the party asserting the existence of an implied agreement, Jane bore the burden of proof on that issue.[21] She failed to carry her burden.

During this litigation, Jane took a series of positions about the existence of an implied agreement specific to SG Windsor. She first claimed in an interrogatory response that the four siblings agreed in 1987 that she, Allan, and Louisa would act as the managers of SG Windsor. But that was not possible because Simpson Thacher did not form the entity now named SG Windsor until 2002.[22] During her deposition, Jane suggested that she, Allan, and Louisa became managers of SG Windsor in 2012,

---

[19] *Id.*; *see also Weik, Nitsche & Dougherty, LLC v. Pratcher*, 2020 WL 5036096, at *4 (Del. Ch. Aug. 26, 2020) (an implied agreement "represents the presumed intention of the parties as indicated by their conduct.").

[20] *5high LLC v. Feiler*, 2022 WL 3136612, at *7 (Del. Ch. Aug. 5, 2022) (quoting *Levey*, 2014 WL 3811237, at *10); *see also Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, 2014 WL 4930693, at *4 (Del. Oct. 7, 2014) (implied contract existed where party accepted services "without raising any objection to the professional relationship.").

[21] Otherwise, the plaintiffs would have to prove a negative. The burden of proof typically falls on the party asserting the existence of a particular fact. *See, e.g.*, *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *49 (Del. Ch. Nov. 30, 2020) ("Placing the burden on the [defendant] buyer also requires the [defendant] buyer to prove an affirmative fact, rather than forcing the [plaintiff] seller to prove a negative."), *aff'd*, 268 A.3d 198 (Del. 2021); *see generally* 29 Am. Jur. 2d Evidence § 173, Westlaw (database updated May 2024) ("Courts generally do not require litigants to prove a negative, because it cannot be done.").

[22] *Compare* JX 165 (Defendant's Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendant Jane H. Goldman, Answer to Interrogatory No. 4), *with* JX 135 (Mill Neck LLC Certificate of Formation).

14

when the LLC changed its name.[23] But the documents associated with the name change did not support that assertion. When pushed, Jane conceded that she could not recall any discussion or agreement about SG Windsor being a manager-managed entity with Jane as one of the managers.[24] Amy, Diane, and Louisa could not recall any discussion of that point either.[25]

At times, Jane cited a draft, unexecuted operation agreement for Mill Creek (SG Windsor in its earlier guise) that would have established a manager-managed entity.[26] But the most important aspect of that document is the lack of any signatures. The parties did not address why no one signed the draft agreement. Perhaps it slipped through the cracks. Or perhaps the siblings did not like its terms and rejected it.

Without any persuasive evidence of an agreement specific to SG Windsor, Jane widened the aperture. At trial, she contended that the siblings agreed that she would "act as one of the managers of the Goldman family real estate business (alongside Allan and [Louisa])."[27] She thus claimed that she, Allan, and Louisa managed all of the families' entities, including SG Windsor.

---

[23] Jane Dep. at 127.

[24] *See* Jane Tr. 25–26.

[25] *See* Amy Dep. 120, 127–28; Diane Dep. 34–35, 39; Louisa Dep. 87–88.

[26] *See* JX 5.

[27] JX 177 (Defendant's Amended Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendant Jane H. Goldman, Amended Answer to Interrogatory No. 7).

Jane's argument confuses two different concepts of management. Under the LLC Act, "manager" is a term of art. The LLC Act defines a manager as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed."[28] Outside the world of LLCs, the term refers colloquially to the person running things. Restaurants, bank branches, big box stores, and ranches all have managers, but that does not mean those managers are LLC Act managers.[29]

Jane's argument boils down to the reality that she and Allan ran the Goldman family business from 1987 when Sol died until 2022 when Allan died, with Louisa handling the quotidian details. That is true, but in doing so, Jane and Allan acted as colloquial managers. The evidence does not support any agreement that Jane, Allan, and Louisa were managers in the sense that the LLC Act uses the term.

Instead, the record shows that all four siblings acted as LLC member-managers by consulting and reaching consensus on significant decisions. Jane, Allan,

---

[28] 6 *Del. C.* § 18-101(12).

[29] *E.g., Dlyal Hldgs., Inc. v. Al-Bawardi*, 2021 WL 6121724, at *6 (Del. Ch. Dec. 27, 2021) (declining to hold that ranch manager was subject to personal jurisdiction under the LLC Act because while the complaint alleged that he was a lower-case m-manager of the ranch, he was not a capital-m manager); *ATO Enterprises of Delaware, LLC v. Cabrera*, 2022 WL 2678613, at *5 (Del. Ch. July 12, 2022), *report and recommendation adopted,* 2022 WL 2987098 (Del. Ch. July 26, 2022) (same); *see also Matrix Parent, Inc. v. Audax Mgmt. Co., LLC,* 2024 WL 3198380, at *11 (Del. Super. June 27, 2024) ("Managing a discrete task or project on behalf of an LLC is distinct from managing the LLC itself.").

16

and Louisa did not act as if they had plenary authority to manage the business and that Diane and Amy were simply passive investors.

One example involved the PPP loan application. The Property Manager's general counsel circulated an application to be signed by all four siblings with each denominated as a "manager." That makes sense if all four siblings were member-managers while Jane, Allan, and Louisa engaged in colloquial management on the family's behalf. It would not make sense if there was an implied agreement that Jane, Allan, and Louisa held roles as LLC Act managers (or their equivalents) for all of the Goldman family entities. If the latter were true, then Jane, Allan, and Louisa would have signed as managers, and Diane and Amy would have been left out as passive investor-members.

Jane also points to an article about the Goldman family business that appeared in the April 2013 of *The Real Deal*, a real estate publication. The article recounted that "[s]ince [Sol] Goldman's death in 1987, the enigmatic firm—which has Manhattan holdings estimated to be worth some $6 billion—has been headed by Goldman's notoriously under-the-radar children, Jane and Allan, and has seen little change."[30] According to the article, "Jane now heads the company on a day-to-day basis, with Allan working closely with her in an advisory capacity."[31] And the article noted that "[t]wo other children, Amy and Diane, are not actively involved in

---

[30] JX 30 at 2.

[31] *Id.* at 9 (internal quotations omitted).

17

managing the company."[32] After seeing the article, Amy emailed Jane, "SO PROUD

OF YOU."[33] That article discussed colloquial management, and it appropriately gave

credit to Jane and Allan for their roles. The article did not use "manager" as a legal

term of art in the sense the LLC Act contemplates, nor did Amy's supportive note

elevate Jane to the status of an LLC Act manager.

The same is true for an email from Amy's lawyer that she shared with Allan in

May 2018. In that email, her lawyer stated:

> Finally, as I mentioned at the last meeting, there is a need
> to begin a discussion about long term succession planning
> for management of the family business when Jane and
> Alan [sic] are no longer able to provide stewardship.[34]

At trial, Amy agreed with her lawyer that the family needed to discuss who would

run the business after Jane and Allan.[35] But that comports with Jane and Allan

acting as colloquial managers, with the four siblings acting as member-managers. If

Jane and Allan were manager-managers with plenary authority, while Amy and

Diane were just passive investors along for the ride, then Jane, Allan, and Louisa

would have addressed succession planning. The email from Amy's lawyer supports

the plaintiffs' position, not Jane's.

---

[32] *Id.* at 8.

[33] JX 31 at 1; *accord* Amy Tr. 313–14.

[34] JX 52.

[35] Amy Tr. 311–12.

18

The governance structure of the various entities in the Goldman real estate empire delivers the *coup de grâce* for the triumvirate-as-managers-of-everything theory. Simpson Thacher maintained a chart for the various Goldman entities that identified their governance structures and who could sign on each entity's behalf.[36] There is no consistent practice across those entities, and Jane, Allan, and Louisa did *not* hold positions as term-of-art managers or their equivalent across all of the Goldman family entities. There are even written operating agreements for specific entities that identify managers other than the purported triumvirate of Jane, Allan, and Louisa.[37]

In a final appeal, Jane argues that if she was not a term-of-art manager and if all four siblings were member-managers, then Diane and Amy should have been helping her all along, rather than pursuing other interests. But nothing prevents a member-managed entity from relying on agents.[38] Just as a board of directors can manage and oversee the business and affairs of a corporation by relying on officers

---

[36] *See* JX 198.

[37] *See, e.g.*, *id.* at 3 (identifying Jane, Amy, and Diane as "managers" of Plaza Circle Enterprise LLC); *id.* at 10 (identifying Jane, Amy, and Diane as "managers" of Lighthouse Plaza LLC).

[38] *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 9.03[B][2], at 9-22 to 9-23 (2d. ed. 2019) ("A Delaware limited liability company may have officers, employees, and agents . . . . It is equally clear under the statute that a person to whom a member or manager has delegated management authority may be an officer, employee, or agent of the company . . . .").

and agents, so too can a member-managed LLC. Being a member-manager does not mean that the member-managers have to do all the work. A colloquial manager can run the business, with the member-managers making the big decisions. That is what happened with the Goldman family business. Jane and Allan found fulfillment in running the operation and carrying on their father's legacy; Diane and Amy were happy to let them. When doing so, Jane and Allan acted as colloquial managers, not term-of-art managers as contemplated by the LLC Act.

There is yet more evidence cutting against the contention that SG Windsor was a manager-managed LLC, but the foregoing is sufficient. SG Windsor was a member-managed LLC governed by an LLC agreement consisting of the default provisions of the LLC Act.

## B. Whether The Estate Is A Member Of SG Windsor

The plaintiffs next seek a declaration that Allan's estate is a member of SG Windsor. It is not.

When a member of an LLC transfers its member interests to another person, then by default under the LLC Act the recipient of the interest does not automatically become a member.[39] The recipient only holds the rights of an assignee, which consist of the economic rights associated with the interest, plus the power to sue

---

[39] 6 *Del. C.* § 18-702.

derivatively.[40] The assignee does not receive any of the governance rights associated with the interest,[41] nor does an assignee have the right to seek books and records or seek statutory dissolution.[42]

As Chief Justice Strine observed while serving on this court, "[t]here are likely two motivations for the statutory default rules . . . concerning the assignment of a

---

[40] *Id.* § 18-702(a) ("The assignee of a member's limited liability company interest shall have no right to participate in the management of the business and affairs of a limited liability company except as provided in a limited liability company agreement or, unless otherwise provided in the limited liability company agreement, upon the vote or consent of all of the members of the limited liability company."); *id.* § 18-702(b)(1) ("Unless otherwise provided in a limited liability company agreement," "[a]n assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member."); *id.* § 18-702(b)(2) ("Unless otherwise provided in a limited liability company agreement," "[a]n assignment of a limited liability company interest entitles the assignee to share in such profits and losses, to receive such distributions or distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned"); *id.* § 18-1001 ("A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.").

[41] *Hawkins v. Daniel*, 273 A.3d 792, 826–27 (Del. Ch.) ("[A]n effort to transfer an interest in a limited partnership or limited liability company results in the recipient becoming an assignee who possesses economic rights, but not governance rights. The assignee does not receive the full bundle of property rights associated with ownership and hence is called an 'assignee.'"), *aff'd*, 289 A.3d 631 (Del. 2023).

[42] *See* 6 *Del. C.* § 18-305 (providing informational rights to members and managers but not assignees); *id.* § 18-802 (providing the right to seek dissolution to members and managers but not assignees). Given the emphasis that Delaware law places on using the tools at hand before filing a derivative claim, it is somewhat odd that the LLC Act authorizes assignees to sue derivatively but does not give assignees the ability to obtain books and records. But that's what the LLC Act says.

21

limited liability company interest and the assignee's possible (and subsequent) admission as a member of the LLC."[43] The first was tax-related. The imposition of statutory limitations on the free alienability of LLC member interests formed a critical part of early attempts "to create an entity that, as a matter of tax law, is classified as a partnership with each owner treated as a partner, but whose owners are shielded by state law from automatic personal liability."[44] The adoption of the "check-the-box" tax classification regime rendered that rationale superfluous, but when the LLC Act was drafted, tax implications were top of mind.[45]

"The second reason for the default rules in the [LLC] Act regarding the transferability of [member] interests may rest on the notion that one generally is entitled to select his own business associates in a closely held enterprise, like an LLC."[46] "The policy that underlies § 18-702(b)(3) is that 'it is far more tolerable to have to suffer a new passive co-investor one did not choose than to endure a new co-

---

[43] *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 804 n.14 (Del. Ch. 2011).

[44] Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 447–54 (2009) [hereinafter *Decades*].

[45] *See Metro Storage*, 2019 WL 3282613 at *10 (discussing history of LLCs); Susan Pace Hamill, *The Story of LLCs: Combining the Best Features of a Flawed Business Tax Structure*, in *Business Tax Stories*, 295 (Steven A. Bank & Kirk J. Stark eds., 2005) (same).

[46] *Achaian*, 25 A.3d at 804 n.14.

manager without consent.'"[47] This consideration is often called the "pick-your-partner principle."

To implement these policies, the LLC Act addresses (i) what a member is, and (ii) how an assignee becomes a member. The LLC Act defines a "member" as "a person who is admitted to a limited liability company as a member as provided in § 18-301 of this title."[48] Section 18-301, entitled "Admission of members," identifies how an assignee becomes a member. After the formation of an LLC, a person is admitted as a member "in the case of an assignee of a limited liability company interest, as provided in § 18-704(a) of this title . . . ."[49]

By its terms, Section 18-301 thus looks to Section 18-704(a). Under that provision, the assignee of an LLC interest in an LLC with more than one member can become a member in two ways:

(1) As provided in the limited liability company agreement; [or]

(2) Unless otherwise provided in the limited liability company agreement, upon the affirmative vote or written consent of all of the members of the limited liability company . . .[50]

Until the assignee follows one of those paths, the assignee remains an assignee.

---

[47] *Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 115 (Del. Ch. 2006) (quoting *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 760 (Del. Ch.2004)).

[48] 6 *Del. C.* § 18-101(13).

[49] *Id.* § 18-301(b)(2).

[50] *Id.* § 18-1704(a)(1)–(2).

Steven claims that Allan's estate is a member in SG Windsor. But an LLC member interest is personal property,[51] and "the death of a member who is a natural person must terminate that person's membership."[52] Like other personal property, the interest transfers by operation of law to the deceased member's estate.[53] Under

[51] *Id.* § 18-701 ("A limited liability company interest is personal property.").

[52] Symonds & O'Toole, *supra*, § 5.04[C][1], at 5-56. So does a member's bankruptcy, dissolution, resignation, or expulsion. *See* 6 *Del. C.* § 18-101(1) ("'Bankruptcy' means an event that causes a person to cease to be a member as provided in § 18-304 of this title."); *id.* § 18-304 (setting default rule of termination upon bankruptcy); Symonds & O'Toole, *supra*, § 5.04[B][1], at 5-51 to 5-52 ("A person's effective resignation as a member terminates that person's membership in a Delaware limited liability company."); *id.* § 5.04[E], at 5-58 ("[E]xpulsion is recognized as an event that may terminate a person's membership.").

[53] *See In re Cote d'Azur Est. Corp.*, 2022 WL 4392938, at *16 (Del. Ch. Sept. 19, 2022) ("A member interest in a Delaware LLC is personal property. Accordingly, if Mr. Perry remained the sole member of the LLC at the time of his death, then the member interest became the part of the . . . Estate."); *See* 31 Am. Jur. 2d *Executors and Administrators* § 378, Westlaw (database updated May 2024) [hereinafter, 31 Am. Jur. 2d *Executors and Administrators* § —] ("The general rule is that, with the exception of statutorily exempt property, legal title to personal property of the deceased passes directly to the personal representative, and nothing passes to the heirs or legatees until distribution by this representative."); *id.* § 374 ("As a general rule, the personal representative is vested, from the time that he or she is appointed, with the title to all property of the decedent or at least title to all personal property of an intestate decedent." (footnotes omitted)); *see also Kojro v. Sikorski*, 267 A.2d 603, 606 (Del. Super. 1970) ("Although it has been stated in Delaware that upon the death of a person, legal and equitable title to his personal property vests in his executor or administrator, it is likewise clear that such vesting is for the limited purpose of administration."). The concept of exempt property refers to the fact that "[m]ost states have statutes, designed for the benefit of a decedent's surviving spouse or minor children, specifically exempting some property, such as clothing, jewelry, books, or furniture, from payment of a decedent's debts; such statutorily exempt property vests in the surviving spouse or minor children at the date of death and does not constitute an estate asset." 31 Am. Jur. 2d *Executors and Administrators* § 381 (footnote omitted). An LLC interest is not exempt property.

the LLC Act, the recipient of the interest only receives the rights of an assignee.[54] The estate therefore is currently an assignee, not a member.

Section 18-705 confirms this reading. As discussed in greater detail below, Section 18-705 authorizes the personal representative of a deceased or disabled member to "exercise all of the member's rights for the purpose of settling the member's estate or administering the member's property, including any power under a limited liability company agreement of an assignee to become a member."[55] If the estate of a deceased member automatically became a member, then there would be no reason to enable the personal representative to exercise member rights, because the personal representative already would have them. Likewise, there would be no need to authorize the personal representative to exercise "any power under a limited liability company agreement of an assignee to become a member," because the estate already would be a member.[56]

---

[54] *See* 6 *Del. C.* § 18-702(b)(1) ("An assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member . . . .").

[55] *Id.* § 18-705.

[56] Carter G. Bishop & Daniel S. Kleinberger, *Limited Liability Companies* § 14.40 (2023) ("Does the estate (and, through it, the heirs) simply succeed to membership, 'exercis[ing] all of the [deceased] member's rights' including management rights? The answer is no, for at least two reasons. First, the statute does not make an open-ended grant of rights to the decedent's personal representative. . . . Second, if the phrase 'all of the member's rights' suffices to empower the estate to become a member, why does the statute expressly include 'any power *under a limited liability company agreement* for an assignee to become a member'? The emphasized language suggests that the estate has no greater rights than a living member to foist

Allan's estate thus starts as an assignee. To gain membership status, the estate must follow one of the paths identified in Section 18-704(a).

The estate has not traveled the member-approval path. All of the other members of SG Windsor have not voted for the estate to become a member, so the estate has not qualified as a member by that method.

Focusing on the alternative path, the plaintiffs argue that an implied agreement exists to admit any member's estate as a member. Just as Jane had to prove the existence of an implied LLC agreement under which SG Windsor operated as a manager-managed LLC, so too must the plaintiffs carry the burden of proving the existence of an implied LLC agreement about member admission.

The plaintiffs first point to what seemingly transpired after Lillian's death, when she was the sole member of SG Windsor. When Lillian died, her interest transferred to her estate by operation of law, her estate became an assignee. Under Delaware law as it then existed, that event would have left the LLC with no members, forcing the LLC to dissolve.[57] Without any members, there was also no one to vote to

---

a new member on the LLC.") (italics in original); *see Hillman v. Hillman*, 910 A.2d 262, 275 n.41 (Del. Ch. 2006) (recognizing that under analogous provision of the Delaware Revised Uniform Limited Partnership Act, "Section 17-705 suggests that a partner's estate or personal representative becomes an assignee with § 17-702 rights . . . .").

[57] 6 *Del. C.* § 18-801(a)(4) ("A limited liability company is dissolved and its affairs shall be wound up [if] . . . [a]t any time there are no members . . . .").

26

admit new members, so there would have been no path around dissolution.[58] Yet somehow, SG Windsor did not dissolve. Instead, the four siblings ended up as members, each with a 25% share.

Steven infers that the transition could only work if there was an implied agreement that (i) the estate of a Goldman family member automatically becomes a member in any LLC in which the decedent was a member, and (ii) any beneficiaries of the estate who received member interests in the LLC likewise automatically become members. That is one possibility, but an unlikely one. Another possibility is that just before her death, Lillian transferred some percentage of her member interest to each sibling and admitted them as members, so that after she died, the siblings were already members and could vote unanimously to admit themselves as to the remainder of their interests (assuming that was necessary). Doubtless creative transactional lawyers could identify additional solutions.[59]

---

[58] In 2016, the General Assembly partially addressed this trap for the unwary by amending the LLC Act to provide a special rule for single member LLCs. Under that rule, an assignee of the sole member's interest can opt to become a member after a voluntary transfer. *See* 6 *Del. C.* § 18-704(a)(3). But because the special rule requires a voluntary transfer, it would not apply to a transfer as by operation of law upon the death of the sole member. *See id.* ("An assignment will be voluntary for purposes of this subsection if it is consented to by the member at the time of the assignment and is not effected by foreclosure or other similar legal process.").

[59] If I were to speculate, I wouldn't be surprised if the family's lawyers simply chose to treat the four siblings as members. When all of the parties to a transaction want the same outcome, lawyers can generally create the paper trail necessary to document the desired result, even if that requires some creative backfilling and backdating of documents. Sometimes, however, a dispute arises or the backdating affects third parties, at which point the alternative factual account can quickly

In 2024, over two decades later, it is not possible to determine what happened in 2002. The plaintiffs have offered a theory, but there is no direct evidence to support it, and it is not sufficiently persuasive to carry the day by a preponderance of the evidence.[60]

---

unravel. *See, e.g.*, *Bamford v. Penfold, L.P.*, 2022 WL 2278867, at \*2 (Del. Ch. June 24, 2022) ("In June 2016, Manheim, Ban, and Bamford reorganized the entities and their ownership stakes . . . . Unfortunately, they did so through two poorly drafted agreements that they created themselves, and they backdated one of the agreements for tax purposes so that the first step of the Reorganization appeared to take place in June 2015. Also in 2016, Manheim and Ban hired a law firm to help them clean up their records, but that effort involved the creation of still more backdated documents that sought to fix problems in the entities' corporate structure."), *aff'd sub nom. Manheim v. Ban*, 2024 WL 1716494 (Del. Apr. 22, 2024); *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1026 (Del. Ch. 2020) ("The evidence instead demonstrates that the Rajan brothers executed the May Stockholder Consent later, possibly during the evening of May 8 or on May 9, and then backdated it to May 6 in an effort to preempt the Omnibus Agreement."); *Perry v. Neupert*, 2019 WL 719000, at \*2 (Del. Ch. Feb. 15, 2019) ("In late September or October 2016, Lopag and Neupert manufactured the power of attorney and backdated it to February 5, 2016, ostensibly before Neupert filed the certificate of conversion and certificate of incorporation."); *Choupak v. Rivkin*, 2015 WL 1589610, at \*2 (Del. Ch. Apr. 6, 2015) ("In July 2000, Rivkin prepared an employment agreement for himself using the Company's standard form as a template. Rivkin backdated it to March 1, 2000, reflecting when he started at Intermedia." (citation omitted)), *aff'd*, 129 A.3d 232 (Del. 2015).

[60] This is one of the times when the burden of proof matters beyond those rare occasions when the evidence is in equipoise. *See Goldstein v. Denner*, 310 A.3d 548, 586 (Del. Ch. 2024) ("Although Delaware decisions assert that presumptions and their close cousin—the burden of proof by a preponderance of the evidence—merely determine how a judge rules when the evidence is precisely in equipoise, that is an incomplete description of their effect. Far more often, they determine what happens if there is no credible evidence on a topic, or if there is some credible evidence, but not enough that either side could carry a burden by a preponderance. In each of those common situations, the party favored by the presumption prevails. The party with the burden loses." (footnote omitted)).

The plaintiffs next rely on the Sharing Agreement. That agreement obligated the four siblings to true up any gifts or bequests they received from Lillian during her life or under her will so that they all shared equally. The plaintiffs argue that because the siblings' interests in SG Windsor came from Lillian, the Sharing Agreement applies. They also argue that sharing all benefits equally among the four branches includes sharing governance rights equally among the four branches. They conclude that to share the governance rights in SG Windsor equally among all four branches, the estate must be admitted as a member.

That argument misreads the Sharing Agreement. It obligated the siblings to true up what they received from Lillian. It did not require that the siblings maintain equality among their branches going forward. If, for example, Lillian had bequeathed a total of $100 million to the siblings, with $70 million going to Jane and $10 million each to Amy, Diane, and Allan, then the Sharing Agreement would have obligated the siblings to reallocate that bequest so that each received $25 million. The Sharing Agreement would not have had anything to say about what the siblings could do with their property after the true-up. Nothing in the Sharing Agreement would have prohibited one of the siblings from giving the $25 million to a charity or gambling it away. By the same token, after the siblings allocated the member interests in SG Windsor so that each received a 25% allotment, then the Sharing Agreement was satisfied. From that point on, the siblings could do whatever they wanted with their interests. The Sharing Agreement does not obligate the other siblings to admit the estate as a member.

29

The plaintiffs also point to a handful of LLC agreements of *other* limited liability companies that expressly provide for the automatic admission of estates or lineal descendants as members of those entities. That is true, but there is no consistent practice across the Goldman family entities as to that issue either, and some agreements expressly prohibit the admission of any replacement member absent all other members' consent.

Shifting gears, the plaintiffs cite the Schedule K-1s for 2022, which identify Allan's estate as an "LLC member" of SG Windsor during that year. The Schedule K-1s are not persuasive. The schedule only offers only two options: (i) "General partner or LLC member-manager" or (ii) "Limited partner or other LLC member."[61] Contrary to both sides' theories, SG Windsor checked the *second* box for all three living siblings and Allan's estate.[62] If the plaintiffs are right about the estate and all three living siblings being member-managers, then each Schedule K-1 should have selected "General partner or LLC member-manager." By contrast, if Jane is right that SG Windsor is a manager-managed entity, then her Schedule K-1 should have selected "General partner or LLC member-manager," and Allan should have done the same for the period when he was alive. By contrast, the estate, Amy, and Diane should have checked "Limited partner or other LLC member." The tax treatment on the Schedule K-1s is therefore contradictory and inconclusive.

---

[61] *See, e.g.*, JX 142 at 26, 29, 33, 36.

[62] *Id.* at 29.

The plaintiffs have failed to carry their burden to show that the estate is already a member of SG Windsor. The estate has the status of an assignee.

## C. Whether Steven Can Exercise Member-Manager Powers Under Section 18-705

The plaintiffs last seek a declaration that under Section 18-705 of the LLC Act, Steven can assert the governance rights that Allan could have exercised as a member for the purpose of administering and settling his estate. Jane concedes the point generally, but she argues that Steven can only assert member rights to the extent *necessary* to administer Allan's estate, and she takes a narrow view of what constitutes administration.

To put it mildly, this is not a well-developed area of Delaware law. As the leading Delaware LLC treatise put it:

> The full extent of the interplay between Section 18-705 and other provisions of the statute that establish rights or default rules, such as Sections 18-603 and 18-702(a) regarding restrictions on transfer of limited liability company interests [i.e., economic interests], and Section 18-407 regarding delegability of management rights, powers and duties, remains to be determined.[63]

The issues that this decision confronts about the scope of Section 18-705 largely present issues of first impression.

### 1. The Plain Language Of Section 18-705

The starting point in statutory construction is "to determine the legislative intent from the language or text of the statute itself . . . . Typically, the process of

---

[63] Symonds & O'Toole, *supra*, § 5.04[C][1], at 5-56 to 5-57.

giving effect to the intent of the legislature begins and ends with the statutory text. The statutory words should be given the meaning intended by the lawmakers."[64]

> It is a familiar rule of construction that when a statute uses words which have a definite and well-known meaning at common law, it will be presumed that the terms are used in the sense in which they were understood at common law, and they will be so construed unless it clearly appears that it was not so intended.[65]

"An unambiguous statute precludes the need for judicial interpretation, and 'the plain meaning of the statutory language controls.'"[66] "A statute is ambiguous if 'it is

---

[64] 82 C.J.S. *Statutes* § 393, Westlaw (database updated May 2024) (footnotes omitted); *accord Kofron v. Amoco Chemicals Corp.*, 441 A.2d 226, 230 (Del. 1982); *see also Angstadt v. Red Clay Consol. Sch. Dist.*, 4 A.3d 382, 390 (Del. 2010) ("In interpreting undefined statutory terms, we must give them a 'reasonable and sensible meaning in light of their intent and purpose.'" (quoting *E. I. Du Pont De Nemours & Co. v. Clark*, 88 A.2d 436, 438 (Del. 1952)).

[65] 73 Am. Jur. 2d *Statutes* § 135, Westlaw (database updated May 2024) [hereinafter, 73 Am. Jur. 2d *Statutes* § —]; *accord id.* § 84 ("When a state legislature couches its enactment in common law language, the courts presume that it intended to carry over such rules as were part of the common law into statutory form."); *see* 1 *Del. C.* § 303 ("Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."). *Compare Sekhar v. United States*, 570 U.S. 729, 733 (2013) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)), *and Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."), *with United States. v. Guidry*, 456 F.3d 493, 509 (5th Cir. 2006) ("We do not use the common law definition of any term where it would be inconsistent with the statute's purpose, notably where the term's definition has evolved." (collecting authorities)).

[66] *LeVan v. Independence Mall, Inc.*, 940 A.2d 929, 932–33 (Del. 2007) (quoting *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999)).

reasonably susceptible of different conclusions or interpretations' or 'if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature.'"[67] "The fact that the parties disagree about the meaning of the statute does not create ambiguity."[68]

Section 18-705 is a challenging statute that could benefit from thoughtful legislative attention. It currently states:

> If a member who is an individual dies or a court of competent jurisdiction adjudges the member to be incompetent to manage the member's person or property, the member's personal representative may exercise all of the member's rights for the purpose of settling the member's estate or administering the member's property, including any power under a limited liability company agreement of an assignee to become a member. If a member is a corporation, trust or other entity and is dissolved or terminated, the powers of that member may be exercised by its personal representative.[69]

---

[67] *LeVan*, 940 A.2d at 933 (quoting *Newtown Vill. Serv. Corp. v. Newtowne Rd. Dev. Co.*, 772 A.2d 172, 175 (Del. 2001)).

[68] *Chase Alexa, LLC v. Kent Cty. Levy Court*, 991 A.2d 1148, 1151 (Del. 2010).

[69] 6 *Del. C.* § 18-705. Although not directly at issue in this case, the last sentence of Section 18-705 refers to a personal representative exercising the rights of an entity-member after the termination of the entity. That is difficult to comprehend. The shutting down of an entity involves two distinct events that bracket an intermediate period of activity. The first event is dissolution, marking the point at which the entity enters the intermediate period called winding up. The second event is termination, which takes place after the entity completes winding up. Transactional lawyers can draw a rough analogy to signing a deal (comparable to dissolution), the post-signing and pre-closing period (analogous to winding up), and closing (comparable to termination).

A treatise suggests comparing the termination of an entity member with the death of a human member. *See* Symonds & O'Toole, *supra*, § 5.04[C][1]. But for an entity, termination is the end. After termination, the entity is kaput. For a human

member, death gives rise to an estate that an executor must administer. The proper comparisons are (i) human death with entity dissolution, (ii) the administration of an estate with winding up, and (iii) the settlement of an estate with entity termination.

Consider how the reference in Section 18-705 to a personal representative exercising an entity's rights after "dissolution or termination" would apply to a corporation. A corporation can dissolve voluntarily, by court order, or when it "expire[s] by [its] own limitation." 8 *Del. C.* § 278. Dissolution marks the start of the winding-up period: a three-year extension of the corporation's existence in which the entity organizes its affairs in order to close. *Id.* During winding-up, the corporation cannot initiate any new business, but it can continue operating its existing business in preparation for a sale or to ensure a smooth winddown. Other tasks during the winding-up phase include marshalling assets, discharging or establishing reserves for liabilities, and ultimately distributing any remaining assets to stockholders. *Id.* If necessary, a court can extend the winding-up process "for the purpose[s] of prosecuting and defending suits by or against it" and "gradually settl[ing] and clos[ing] its business." *In re Citadel Indus., Inc.*, 423 A.2d 500, 504 (Del. Ch. 1980). At the end of the winding-up period, the corporation's existence terminates. Termination means what it says: the end of the corporation's separate legal existence. After termination, the corporation has no power to conduct its affairs. *In re Krafft-Murphy Co.* 82 A.3d 696, 710 (Del. 2013).

An LLC goes through the same progression. Dissolution marks the start of a winding-up period. *See* 6 *Del. C.* § 18-801(a). During the winding up phase, the LLC engages in the same tasks as the corporation: marshalling its assets, discharging or establishing reserves for liabilities, and ultimately distributing any remaining surplus to its members. *See id.* §§ 18-803, 18-804. At the end of the winding up process, an authorized person files a certificate of cancellation, *id.* § 18-203, which terminates the LLC's existence. *See id.* § 18-201(b). Cancellation is termination, and it means just that. *See In re Reinz Wisconsin Gasket, LLC*, 2023 WL 3300042, at *1 (Del. Ch. May 8, 2023) ("Counsel's purported representation of a defunct limited liability company is not only puzzling, but impossible.").

The reference in Section 18-705 to a personal representative exercising the rights of an entity member after "termination" thus initially makes little sense. But it turns out that there is a section in the LLC Act that authorizes a court to appoint a trustee or receiver for a cancelled (i.e. terminated) LLC. Under that statute, the court can empower the trustee or receiver to

> take charge of the limited liability company's property, and to collect the
> debts and property due and belonging to the limited liability company,

34

The LLC Act defines "personal representative" to mean "as to a natural person, the executor, administrator, guardian, conservator or other legal representative thereof and, as to a person other than a natural person, the legal representative or successor thereof."[70]

with the power to prosecute and defend, in the name of the limited liability company, or otherwise, all such suits as may be necessary or proper for the purposes aforesaid, and to appoint an agent or agents under them, and to do all other acts which might be done by the limited liability company, if in being, that may be necessary for the final settlement of the unfinished business of the limited liability company.

6 *Del. C.* § 18-805.

Because that statute envisions a post-termination representative doing what is necessary to complete the winding up process, I personally would encourage a revision that authorizes the court to revoke the certificate of cancellation, appoint representatives to complete the winding up process, and then file a new certificate of cancellation once winding up is complete. That is what happens with a corporation, where the winding up process ends by default three years after dissolution, but a court can extend or reopen the winding up process. *See* 8 *Del. C.* § 279. Taking that approach in the LLC Act would have the benefit of intellectual and doctrinal coherence, because it would preserve the distinctions between dissolution, winding up, and cancellation/termination. But it might bump into practitioner concerns that I am not appreciating.

[70] 6 *Del. C.* § 18-101(13). The reference to "successor thereof" in the definition further complicates the application of the last sentence of Section 18-705. To reiterate, that sentence states: "If a member is a corporation, trust or other entity and is dissolved or terminated, the powers of that member may be exercised by its personal representative," defined for a person other than a natural person, as "the legal representative or successor thereof." *Id.* § 18-705. But what does "successor" mean? The LLC Act does not tell us. And who does thereof refer to? Is it the successor to the entity, or is it the successor to the personal representative? The type of entity successor that most readily springs to mind is a successor by merger. But does the definition of "personal representative" really imply that a member's successor by merger might not be limited by default rights as an assignee but rather might be able exercise member-level governance rights "for the purpose of . . . administering the

Steven interprets the statutory language broadly. He reads the plain meaning of Section 18-705 as applying in two scenarios. The first arises "[i]f a member who is an individual dies," resulting in the creation of an estate and the appointment of a personal representative—an executor or administrator—taking over the deceased person's affairs for the purpose of administering and settling the estate (the "Executor Scenario"). The second arises if "a court of competent jurisdiction adjudges the member to be incompetent to manage the member's person or property," resulting in the appointment of a personal representative—a guardian or conservator—taking over the disabled person's affairs for the purpose of acting on the disabled person's behalf (the "Disability Scenario").

Steven reads the plain language of the statute to say that in both scenarios, "the member's personal representative may exercise all of the member's rights for the purpose of settling the member's estate or administering the member's property" (the "Purpose Clauses"). Under his reading, any personal representative can exercise "all of the member's rights" to the extent the personal representative seeks to do one of two things: settle the deceased member's estate or administer the deceased member's property that has become part of the estate. And he reads "all of the member's rights" to mean just that—all of the member's governance rights in addition to any economic rights.

---

member's property"? A thoughtful and nuanced revision to Section 18-705 and the definition of personal representative could work through these policy issues and provide welcome guidance for the court.

Jane interprets the statute narrowly. She too reads the plain meaning of Section 18-705 as applying in the Executor Scenario and the Disability Scenario, but she applies the distributive phrasing canon of interpretation.[71] To illustrate how that canon works, she offers the following statement: "Men and women are eligible to become members of fraternities and sororities." She explains that under the distributive phrasing canon, the sentence plainly means that men are eligible to become members of fraternities and women are eligible to become members of sororities.

Applied to Section 18-705, Jane sees two disjunctive pairings. The first identifies the two scenarios: the Executor Scenario and the Disability Scenario. The second identifies actions that a personal representative can take: settle the member's estate or administer the member's property. She argues that the distributive-phrasing canon calls for matching the first concept in both disjunctive pairings and the second concept in both disjunctive pairings. Thus "settling the member's estate" correlates solely to the Executor Scenario ("a member who is an individual dies"), while "administering the member's property" correlates solely to the Disability Scenario ("a court of competent jurisdiction adjudges the member to be incompetent

---

[71] Jane does not draw this principle from Delaware precedent. At oral argument, she relied on Josh Blackman, *70 Principles of Statutory Interpretation Everyone Should Know*, https://www.flcourts.gov. Her brief also cites Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation Of Legal Texts* 214 (2012) (explaining that under the distributive phrasing canon of construction, "[d]istributive phrasing applies each expression to its appropriate referent").

to manage the member's person or property"). Jane concludes that Steven, as the executor of Allan's estate, only has power to exercise member rights for the purpose of "settling the member's estate" and not for "administering the member's property." She finds support for this interpretation in a treatise the argues for this construction,.[72] but the leading treatise on Delaware LLCs does not share that view. The Delaware treatise describes the statute's operation consistent with Steven's positon.[73]

Only Steven's interpretation is reasonable, because handling an estate requires not only ultimately settling the estate, but also estate administration. The requirements an executor must fulfill vary from state to state and are typically

[72] Bishop & Kleinberger, *supra*, § 14.40 ("The Delaware LLC Act makes only a very narrow grant of management rights to the decedent's personal representative; the grant is 'for the purpose of settling the member's estate.' In contrast, the 'personal representative' of an incompetent member 'may exercise all of the member's rights for the purpose of . . . administering the member's property.'").

[73] *See* Symonds & O'Toole, *supra*, § 5.04[C][1], at 5-56 ("Section 18-705 of the DLLC Act provides that the personal representative of an individual member who has died or has been adjudged by a court of competent jurisdiction incompetent to manage his or her person or property, may exercise all of the member's rights for the purpose of settling the member's estate or administering the member's property."); *accord id.* § 8.04[B][1]. The leading Delaware treatise on limited partnerships describes the comparable limited partnership provision in the same way. Martin I. Lubaroff & Paul M. Altman, *Lubaroff & Altman on Delaware Limited Partnerships* § 4.25 (2d ed. 2022)("Section 17-705 provides that, if a general partner of a Delaware limited partnership who is an individual dies or a court of competent jurisdiction adjudicates such individual to be incompetent to manage his or her person or property, the general partner's personal representative may exercise all of the general partner's rights for the purpose of settling his or her estate or administering his or her property . . . .").

established by statute, but they invariably include "the orderly and speedy administration, liquidation, and settlement of the estate."[74] This court has observed that "[d]uring [the] period [of estate administration], an administrator should reduce the decedent's personal assets to possession, pay the debts of the estate, and distribute the balance to those entitled to it."[75]

Under estate law, "[t]he purposes of administration are to collect the assets of the decedent, pay his or her debts and expenses, and make distribution to the persons entitled thereto, and to do so in an orderly, expeditious, and efficient fashion."[76] According to a venerable Delaware case,

---

[74] 34 C.J.S. *Executors and Administrators* § 209, Westlaw (database updated May 2024) [hereinafter, 34 C.J.S. *Executors and Administrators* § —]. Given the possibility of divergence between the general common law, Delaware statutory law, and the laws of other states, this decision has relied heavily on black-letter authorities. For example, "[t]he administration of the estate of a decedent is governed by the law of the state of the decedent's domicile at death." *Id.* § 8. The Purpose Clauses could result in a personal representative in a state that gave executors relatively limited powers having fewer rights than a personal representative in a state that gave executors relatively broad powers.

[75] *Matter of Est. of Hedge*, 1984 WL 136921, at *3 (Del. Ch. Feb. 8, 1984). According to one source, "[t]he term 'settlement,' strictly speaking, means the adjustment of the claims and demands in favor of and against the estate and does not include the distribution of the estate." 34 C.J.S. *Executors and Administrators* § 914; *see also id.* § 917 ("A final settlement cannot be made before the estate has been fully administered, with collections made and the debts and legacies paid.").

[76] 33 C.J.S. *Executors and Administrators* § 3. There is a strong parallel between these functions and the stages involved in wrapping up an entity's affairs, discussed above. The decedent's death marks the start of the process, comparable to the act of dissolution. The administration of the estate corresponds to the winding up of the entity's affairs. And the final settlement of the estate wraps up the process, just as termination or cancellation finally ends the winding up phase.

39

An administrator is the personal representative of his intestate, and, by virtue of his appointment and qualification, is invested with the legal ownership of all the goods and chattels, rights and credits which belonged to the deceased at the time of his death. His first duty, after completing an inventory of the personal property, is to collect outstanding debts due to the estate, sell the movable property when necessary, pay the debts due from the estate and distribute the surplus, if any, according to law. For these ends he acquires a property in all the assets of the estate, and is the owner of them from the time of the intestate's death until a final settlement is made.[77]

"[A]dministration also involves all that may be done rightfully in preserving the assets," such as defending against "adverse claims to [the estate's] assets" and prosecuting claims for monetary recovery.[78] "The right and liability of personal

---

[77] *Fid. Ins. Tr. & Safe Deposit Co. v. Niven*, 11 Del. (6 Houst.) 64, 81–82 (1880); *accord Theisen v. Hoey*, 58 A.2d 569, 571 (Del. Ch. 1948) ("In administering an estate according to law, in general it is the duty of personal representatives to collect any debts due the deceased, to convert other personal property into cash, and after the payment of the debts of the deceased and the deduction of all other proper charges and expenses, to pay any balance there may be to the person or persons entitled thereto."); *see* 34 C.J.S., *Executors and Administrators* § 209 ("An executor or administrator has a duty to preserve the assets of the estate to which they are entrusted. A personal representative's duty is to act on behalf of the estate with the end goal of distributing and closing that estate.").

[78] 33 C.J.S. *Executors and Administrators* § 3; *see id.* § 175 ("All debts, claims, rights, choses in action, and surviving rights of action of decedent, of every kind, reducible to money, vest in the executor or administrator, to be collected or sued on or transferred for the benefit of the estate . . . . The representative also becomes invested with the general rights of action pertaining to personal property, including a right of action to recover personal property, or for injuries to such property, as well . . . ."); *id.* § 823 ("The executor or administrator of a deceased person may sue or be sued on causes of action connected with the estate committed to their care."); *id.* § 824 ("Estate representatives have been found entitled to maintain various particular actions, such as actions in tort, in contract, or to determine property rights." (footnotes omitted)); *id.* § 827 ("[I]f the fruits of recovery from a cause of action accruing after decedent's death will be assets of the estate, the representative may sue in either a representative or an individual capacity."); *see also id.* § 169

representatives to sue and be sued are commensurate with the powers and duties imposed on them by statute."[79]

Whether the executor can manage or operate the decedent's business depends on the powers granted to the executor, either by statute or under the decedent's will. Under the common law, "[t]he conduct of a business operation is normally outside the scope of the duties of an executor or administrator."[80] Unless the decedent gives the executor different powers, the executor can only continue the decedent's business for a limited time for the purpose of selling it as a going concern, winding up its operations and converting it to cash, or transferring the business in accordance with

---

("Property, including causes of action, accruing to a decedent after death, is part of the decedent's estate."); 31 Am. Jur. 2d *Executors and Administrators* § 990 ("A representative is charged with the duty of collecting the goods, chattels, and debts of a deceased and preserving them for the estate and is a proper party to bring an action toward that end. . . . Thus, for example, the executor of the estate of a deceased noteholder holds title to the note and is the proper party to bring suit on the note.").

[79] 33 C.J.S. *Executors and Administrators* § 823. *E.g.*, 10 *Del. C.* § 3701 ("All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued. Accordingly, all actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued."); 10 *Del. C.* § 3704 ("No action brought to recover damages for injuries to the person by negligence or default shall abate by reason of the death of the plaintiff, but the personal representatives of the deceased may be substituted as plaintiff and prosecute the suit to final judgment and satisfaction."). *See also Lumb v. Cooper*, 266 A.2d 196, 197 (Del. Super. 1970) (discussing possibility for states' laws to diverge regarding personal representative standing to assert wrongful death claim).

[80] 31 Am. Jur. 2d *Executors and Administrators* § 429.

41

the decedent's wishes.[81]

In contrast to the concept of estate administration, the concept of settlement is more limited. Settlement brings the estate to a close, with the personal representative providing an accounting to the court with jurisdiction over the estate and to those with an interest in the estate.[82] "The final account should show the inventory value

_____

[81] *See generally In re Kurkowski's Est.*, 409 A.2d 357, 361 (Pa. 1979) ("The personal representative's duty to settle the estate must be viewed with reference to the situation of the assets at the time of decedent's death. Thus, he has no duty to carry on a business conducted by the decedent. On the contrary, a personal representative breaches his trust if he continues to operate a trade or business on behalf of an estate in the absence of testamentary direction or the consent of all interested persons. . . . This general rule is subject to the limitation that the personal representative may continue operating a business of the decedent for a limited time without liability for the purpose of selling the business as a going concern or winding up the business by converting the assets into cash or performing existing contracts of the decedent." (citations omitted)); *In re Gibson's Est.*, 261 N.Y.S. 2d 550, 554 (N.Y. Sur. Ct. 1965) ("Generally a fiduciary may not continue the decedent's business unless explicit and specific authority may be found in the decedent's will, or if it is continued temporarily for the purpose of liquidation." (citations omitted)); 31 Am. Jur. 2d *Executors and Administrators* § 429 ("Notwithstanding the general rule against unauthorized continuation of a decedent's business, a sound administrative discretion may require some latitude in closing out a decedent's business, and an executor or administrator may be justified in temporarily continuing a business for the purpose of winding it up or liquidating it."); *id.* § 431 ("A statute may authorize an executor or administrator to continue or carry on the business of the decedent where it is for the best interest of the estate, and the probate court approves." (footnote omitted)).

[82] *See* 34 C.J.S. *Executors and Administrators* § 981 ("The final settlement of decedent's estate must provide a just and true account of the money collected by the personal representative as a requirement for court approval of the settlement. . . . The balance for distribution should be shown in the account."); *id.* § 916 ("It is the primary duty of an administrator or executor to render a full and true account of the administration of the estate and to make complete disclosure of all relevant data pertaining thereto." (footnote omitted)); *see also id.* § 914 ("An accounting is the personal representative's statement under oath of the amount of money received and

of the items the representative is chargeable with, which may be corrected by . . .

evidence indicating their actual value, or by loss or destruction of property."[83]

Because handling an estate requires administering its assets before the ultimate settlement of the estate's affairs, an executor must have the ability to do both. Other jurisdictions have interpreted provisions analogous to Section 18-705 to support this outcome. New York courts have consistently construed the comparable New York statute to permit the executor of a deceased member to exercise governance rights for the purpose of settling an estate.[84] An intermediate appellate court in

spent, and a settlement is an adjustment of the claims in favor of and against the estate.").

[83] 34 C.J.S. *Executors and Administrators* § 981.

[84] *See, e.g., Crabapple Corp. v. Elberg*, 153 A.D.3d 434, 435 (1st Dep't 2017) (interpreting the nearly-identical NY LLCL § 608, holding that the deceased member's "controlling interest in the LLCs passed to his estate upon his death," and that, consequently, the "co-executors of the estate[] had the *authority to act as co-managers* of the LLCs" (emphasis added)); *Andris v. 1376 Forest Realty, LLC*, 213 A.D.3d 923, 924 (2d Dep't 2023) (holding that the executor was empowered "to exercise the decedent's rights in the LLC for the purpose of settling the estate"); *Est. of Judith Lindenberg v. Winiarsky*, 2021 WL 1794560, at *1-2 (N.Y. Sup. Ct. May 05, 2021) (contrasting the personal representative with an assignee and clarifying that the former "can act with all rights the member enjoyed for the defined purposes enumerated in [§ 608]"); *Pachter v. Winiarski*, 2021 WL 1794565, at *1–2 (N.Y. Sup. Ct. May 05, 2021) (confirming that the surviving members "must accept the Estate as a replacement of [the deceased member] in a seamless transition"); *see also In re Bookhamer v. Karten - Bermaha Textiles Co., L.L.C.*, 2004 WL 7329684, at *3 (N.Y. Sup. Ct. Dec. 14, 2004) (confirming the executors' rights under LLCL § 608 to seek information related to the deceased's interest, including information that may "support possible claims of mismanagement affecting the value of that interest").

Virginia[85] and the Supreme Court of Ohio[86] have reached the same conclusion.

Under Jane's reading of Section 18-705, a personal representative of a deceased member could exercise the member's rights for the purposes of estate settlement, but not for the purposes of estate administration. Under that reading, an executor could not exercise member-level rights for the bulk of what an executor has to do. A personal representative only could exercise member-level rights for the final act of settlement. That is not a reasonable reading of Section 18-705.

To bolster her reading, Jane argues that authorizing an executor to engage in administration means that the extent to which an executor can exercise member-level rights will vary depending on the jurisdiction in which the estate is subject to probate and the powers granted to the executor. Jane argues that public policy demands that all personal representatives operate under a single governing law, with Section 18-705 of the Delaware LLC Act providing the definitive expression of what an executor or other personal representative can do.

The extent to which Delaware LLC law can or should overrides the estate law of other jurisdictions would present a knotty choice of law problem that the parties

---

[85] *Friedberg v. Hague Park Apartments Ltd. P'ship*, 2001 WL 34157592, at *6 (Va. Cir. Ct. Dec. 3, 2001) (interpreting § 50-73.48 of the Virginia Limited Partnership Act to "in no way circumscribe[] the power of the executor to exercise all powers previously held by the deceased limited partner").

[86] *Holdeman v. Epperson*, 857 N.E.2d 583, 587–88 (Ohio 2006) (rejecting attempt to read in extra-statutory limitations on the specific rights the personal representative could exercise).

44

have not fairly presented. With ever increasing frequency, practitioners argue that

Delaware entity law should take precedence over areas of law that carry significance

for other jurisdictions.[87] But under a truly contractarian approach to entity law—and

LLCs are primarily creatures of contract[88]—there is no need for Section 18-705 to

[87] *See, e.g.*, *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 730 (Del. Ch. 2023) ("But Sunder filed suit here—in Delaware—because Sunder is a Delaware LLC and its lawyers deployed the now widespread legal technology of inserting restrictive covenants into an internal governance document. Businesses and their lawyers do that so they can invoke Delaware's contractarian regime and argue that it should override how other jurisdictions regulate restrictive covenants. That legal technology calls on the Delaware courts to adjudicate post-employment disputes for the country and potentially the world. In the past five years alone, the Court of Chancery has issued written decisions addressing disputes over restrictive covenants for businesses operating in Hong Kong, Italy, Alabama, Arizona, California, Colorado, Idaho, Illinois, Louisiana, Nebraska, New Jersey, New York, Oklahoma, and Texas. Only two businesses operated in Delaware, one of which filed two cases." (footnotes omittes)). *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 804 n.4 ("Delaware court have confronted with increasing frequency situations in which parties have attempted to use choice-of-law provisions selecting Delaware law to bypass the substantive law of sister states. In this court, the conflicts most often involve agreements containing restrictive covenants." (collecting authorities)).(Del. Ch. 2020). *See generally* Ann M. Lipton, *Inside Out (or, One State to Rule Them All): New Challenges to the Internal Affairs Doctrine*, 58 Wake Forest L. Rev. 321, 323–24 (2023) ("The current scope of the internal affairs doctrine undermines states' ability to regulate economic activity within their territory, as laws enacted to protect their residents and promote state policies are evaded by entity founders who choose to organize in Delaware despite maintaining all substantive operations in other locations. More importantly, citizens who reside in the affected states—those outside of Delaware--have no voice in policy choices that may directly affect their lives. And it appears that states all too often acquiesce in this arrangement, perhaps because it allows them to evade responsibility for difficult political choices.").

[88] *In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract . . . ."). "The adverb 'primarily' is important and should not be overlooked." *Godden v. Franco*, 2018 WL 3998431, at *7 n.17 (Del. Ch. Aug. 21, 2018). That is because there are "core attributes of the LLC" that are not contractual and which "only the sovereign can authorize, such as its separate legal

provide a one-size-fits-all solution. Let a thousand contractarian flowers bloom.

To be sure, the rights that an executor can exercise can vary based on what the law of the probate jurisdiction provides or what the decedent authorizes the executor to do, but the member rights that the executor can potentially exercise can vary as well. "Using the contractual freedom that the LLC Act bestows, the drafters of an LLC agreement can create an LLC with bespoke governance features or design an LLC that mimics the governance features of another familiar type of entity."[89] As is the case here, drafters can accept the statutory default of a member-managed governance arrangement, which has strong functional and historical ties to the

---

existence, potentially perpetual life, and limited liability for its members." *In re Carlisle Etcetera LLC*, 114 A.3d 592, 605 (Del. Ch. 2015); *accord Holsopple*, 241 A.3d at 809 (Del. Ch. 2020) ("A Delaware LLC is 'a separate legal entity' created through Delaware's sovereign power as a state."); *see Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *17 & n.193 (Del. Ch. May 31, 2022) (discussing entity attributes that only a sovereign can authorize); *In re Coinmint, LLC*, 261 A.3d 867, 908–10 (Del. Ch. 2021) (discussing the role of the sovereign in authorizing an LLC and declining to dissolve an LLC domiciled in Puerto Rico). An LLC agreement cannot be an exclusively private contract among its members "precisely because the LLC has powers that only the State of Delaware can confer." *Carlisle*, 114 A.3d at 606; *see Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659–63 (Del. Ch. 2012); *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849–56 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012). Professor Mohsen Manesh has identified thirteen reasons why LLCs are not wholly contractual and only partially creatures of contract. *See* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391 (2018). *See generally Decades*, *supra*, at 460–71 (identifying historical, jurisprudential, and policy reasons why LLCs should not be regarded as purely contractual entities); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities*, 39 J. Corp. L. 295, 315–24 (2014) (reviewing empirical studies and presenting data about alternative entity agreements that undermine premises of purely contractarian approach).

[89] *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016).

general partnership (albeit with limited liability for the members).[90] Drafters can also opt to have a single managing member and other, generally passive, non-managing members, which closely resembles a limited partnership and is also used as a substitute. Or drafters can opt for a manger-managed entity, create a board of managers, create classes of member units that resemble common and preferred shares, and incorporate other corporate features. In an LLC that resembles a corporation or a limited partnership, the member's rights available for the executor of a non-managing member will be quite narrow. In an LLC that resembles a general partnership, the "member's rights" will be broad. Drafters can take these issues into account, just as they take into account other issues presented by the contractual freedom that the LLC Act provides. Whatever rights the executor can exercise remain subject to the ceiling that Section 18-705 imposes: they have to be used for a proper purpose of either settling an estate or administering the former member's property.[91]

---

[90] *See* 6 *Del. C.* § 18-402 (establishing the default rule that management of an LLC is "vested in its members in proportion to the then current . . . interest of members in the profits of the limited liability company owned by all of the members," with the decision of members owning a majority of such profit interest controlling); *Kelly v. Blum*, 2010 WL 629850, at *11 n.73 (Del. Ch. Feb. 24, 2010) (identifying parallel between member-managed LLC and partnership); Symonds & O'Toole, *supra*, § 9.01[A][1], at 9-5 (noting that as in a general partnership, the LLC Act's "default framework generally contemplates a unity of membership and management control.").

[91] An alternative version of Section 18-705 might well identify a list of specific member rights that a personal representative could exercise. Or an alternative version might distinguish between LLCs where members have broad governance rights and LLCs where certain members have limited governance rights. An alternative version might even distinguish between the rights that a personal

The possibility of executors exercising different bundles of rights does not pose a problems for an entity grounded on the ideal of bespoke agreements tailored for specific parties and particular settings. Section 18-705 need not impose a universal standard for personal representatives everywhere. Its plain meaning controls.

## 2. The Interaction Between Section 18-705 And The Pick-Your-Partner Principle

To support a narrower reading of Section 18-705, Jane also cites the pick-your-partner principle. As discussed previously, the default provisions of the LLC Act incorporate pick-your-partner concepts. But neither those default rules nor the general policy of being able to pick your partner override the specific language of Section 18-705. That section reflects a conscious legislative decision to incorporate other policies, such as fairness to a member who has died or suffered a disability.

The pick-your-partner principle is an important default rule in LLC law, but it is not mandatory. Parties can contract around the pick-your-partner principle in an

---

representative could exercise in the Estate Scenario or in a Disability Scenario. Currently, Section 18-705 does none of that. An alternative version might also address whether an LLC agreement can modify the statutory rules. At present, Section 18-705 omits the phrase "unless otherwise provided in a limited liability company agreement," or some comparable variant. In this respect the LLC Act differs from the Revised Uniform LLC Act, which helpfully contains a single section (105(c)) identifying the provisions that cannot be modified by contract. The Delaware LLC Act, by contrast, scatters that signifier throughout the statute to identify fifty-four default provisions that an LLC agreement can modify. When that phrase does not appear, the natural inference is that the provision is mandatory. The phrase does not appear in Section 18-705, suggesting an intent to ensure that a personal representative possesses the ability to exercise member-governance rights for the two purposes that the statute authorizes.

LLC Agreement by providing for the automatic admission of assignees as members. They can also craft other mechanisms that are less onerous than the requirement of a unanimous vote by the other members.

Section 18-705 reflects a compromise between at least two policies: the non-mandatory pick-your-partner principle and a desire to treat a member fairly following an adverse life event. Section 18-705 implements the pick-your-partner principle by recognizing that a member interest that flows to an estate only has assignee status. But Section 18-705 counterbalances that limitation by enabling the executor to exercise member-level governance rights for limited purposes.

The history of Section 18-705 evidence a steady broadening of the powers afforded to personal representatives, notwithstanding the consequences for the pick-your-partner principle. "[I]n the interpretation of a statute, it is proper to look to the origin of the act or of the section being construed, or to the sources from which it was derived."[92] "'The legal history of a statute, including prior statutes on the same subject, is a valuable guide for determining what object an act is supposed to achieve' because frequently legislative enactments are not accompanied by a contemporaneous commentary."[93]

---

[92] 73 Am. Jur. 2d *Statutes* § 83.

[93] *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 495 (Del. 2000) (quoting 2A Norman F. Singer, *Sutherland Statutory Construction* § 48.03, at 315 (5th ed. 1992)); *accord Sussex Cty. Dep't of Elecs. v. Sussex Cty. Republican Comm.*, 58 A.3d 418, 423 (Del. 2013). *See generally* 73 Am. Jur. 2d *Statutes* § 66 ("The purpose of a statute may in part be gathered from the whole act. In determining such purpose, resort may be

"[M]uch of the language and many of the concepts found in the LLC Act are taken from" the Delaware Limited Partnership Act (the "LP Act").[94] The history of the LLC Act thus largely means the history of the LP Act. That is particularly true for Section 18-705, which tracks the analogous provision of the LP Act. For the origins of the latter provision, we must look to limited partnership law.

### a. Early Limited Partnership Statutes

The American version of the limited partnership has French roots. In 1673, France recognized "the *société en commandite*, in which some partners were treated

---

had not only to the context but also to the structure and scheme of the act, and in some cases, to its legislative history." (footnotes omitted)); 2A *Sutherland Statutory Construction* § 48:3 (7th ed. 2014) ("A statute's legal history may be as important for interpretation as its historical background. Courts discussing an act's legal history usually are speaking more specifically about prior statutes on the same subject, and recent statutes on similar subjects, and the case law interpreting such legislation. Consequently, most analyses of an act's legal history amount to application of the rule of *in pari materia*, even where employing a different vocabulary."); *id.* § 51:3 ("Statutes are in *pari materia*—pertain to the same subject matter—when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object." (footnote omitted)).

[94] Lubaroff & Altman, *supra*, § 13.1.2, at 13-2; *see also id.* at 13-2 to 13-3 ("Recognizing the striking similarities of both the language and concepts of [DRULPA] and the LLC Act, it is logical to conclude that, except where an analogy fails due to a fundamental difference between a Delaware limited partnership and an LLC, such as a difference flowing from the absence of any general liability in an LLC, authorities decided under [DRULPA] should be relevant in interpreting the LLC Act and in dealing with issues relating to LLCs."); *id.* at 13-2 ("[I]n many respects, a member of an LLC is treated like a limited partner is treated under [DRULPA]." (citing 6 *Del. C.* §§ 18-209, 18-301, 18-302, 18-305, 18-306, 18-501, 18-502, 18-603, 18-607, 18-705, 18-803, 18-804, 18-1001, & 18-1101(c)).

as outside investors and granted limited liability."[95] In 1807, France codified its commercial law.[96] The new code provided for a form of limited partnership[97] and received significant attention in the United States.[98]

---

[95]Eric Hilt & Katharine O'Banion, *The Limited Partnership in New York, 1822–1858: Partnerships Without Kinship*, 69 J. Econ. Hist. 615, 615–16, 619 (2009). The concept of the limited partnership "dates at least as far back as twelfth-century Italy, where it was known as the *accomandita*." *Id.* at 1619. In that atavistic entity, a general partner's death caused the entity to dissolve, but the death of a limited partner did not. Instead, a limited partner interest could pass to the limited partner's heirs. Francis J. Troubat, *The Law of Commandatary Limited Partnership in the United* States 439 (1853) ("The reason for the difference is, that it is contrary to common reason, that in *general* or ordinary partnerships, the surviving partners should be obliged to receive the heir of the deceased member as an associate, a person who may be utterly disqualified for their business, while in the *accomandita*, it is wholly immaterial whether the special partner be succeeded by the heir, inasmuch as neither is more than a creditor of his capital invested, and a participant of the profit or loss, after the payment of all the debts.") (citing 1 Gregorio Fierli, *Della Società chiamata Accomandita e di Altre Materie Mercantili secondo le Leggi e Statuti veglianti in Toscana* 46–47 (1803)).

[96] Charles E. Freedeman, *Joint-Stock Business Organizations in France, 1807–1867*, 39 Bus. Hist. Rev. 184, 185 (1965) ("The juridical framework of modern French business organization was established by the *Code de commerce* in 1807, one of the five major codes of the Napoleonic period. It was a codification of commercial law modeled on an earlier partial codification, the Edict of 1673.").

[97] *Id.* at 186 ("[T]he *société en commandite* was a 'limited' (or 'sleeping' or 'silent') partnership in which one or a number of active partners (*gérants*), managed the enterprise, and one or a number of passive or 'limited' partners (*commanditaires*), contributed capital or other assets to the enterprise but were denied participation in management. The *gérants* of a *commandite* . . . were subject to unlimited liability. The *commanditaires*, described in the *Code* as simply lenders of capital (*bailleurs des fonds*), possessed limited liability and were to receive an agreed-upon share of the profits." (footnotes omitted)).

[98] Hilt & O'Banion, *supra*, at 619 ("In France, the *société en commandite* was recognized in its first commercial code, Colbert's Ordinance of 1673, and a more

In 1822, New York adopted the first American limited partnership statute, basing it on the French model.[99] Under the New York statute, a general partner's death caused the limited partnership to dissolve, but if a limited partner died, then the partners could vote to renew the partnership.[100]

In 1838, Pennsylvania took the next step by providing by default for the continuation of a limited partnership after the death of a limited partner.[101] The Pennsylvania statute also provided that a deceased limited partner's "executor or

---

precise specification of the form was included in its 1807 commercial code, which received significant attention in the United States.").

[99] *See id.* ("New York's 1822 statute was an adaptation of the 1807 code's terms relative to the *commandite.*"); *id.* at 620 n.23 ("The initial bill [for the New York statute] contain[ed] long passages taken verbatim from [the] 1814 translation of the 1807 code, which account for more than half of its text."). The statute referred to a limited partner as a "special partner." *See, e.g., Skolny v. Richter*, 139 A.D. 534, 541 (N.Y. App. Div. 1910) ("[T]he special partner, so far as concerns his relations to his general partners, is treated as a mere contributor of capital with none of the rights or liabilities belonging to general partners, such as universal agency, unlimited liability for debts and a property interest in the firm name and good will.").

[100] *See* 1 John Duer et al., *The Revised Statutes of the State of New-York*, pt. II, ch. IV, tit. I, § 12 (1829) ("Every alteration which shall be made in the names of the partners, in the nature of the business, or in the capital or shares thereof, or in any other matter specified in the original certificate, shall be deemed a dissolution of the partnership; and every such partnership, which shall in any manner be carried on after any such alteration shall have been made, shall be deemed a general partnership, unless renewed as a special partnership, according to the provisions of the last section.").

[101] James Dunlop, *The General Laws of Pennsylvania* 858 (2d ed. 1849) ("[T]he decease of special partners shall *not* dissolve [the] limited partnership, unless by the agreement between the parties it is provided that such decease shall have that effect.").

administrator may either continue his interest therein for its unexpired term, for the benefit of his estate, or may sell the same."[102] The executor also had standing to sue for an accounting or to obtain a judgment for any amounts owed to the deceased limited partner.[103] The concept of special rights for an executor was born. New York made similar changes to its statute in 1857.[104]

### b. The Uniform Limited Partnership Act of 1916

The next big event for limited partnership law arrived in 1916 when the National Conference of Commissioners on Uniform State Laws (the "Commissioners") promulgated the Uniform Limited Partnership Act ("ULPA"). At the time, most limited partnership statutes provided for dissolution upon a limited partner's death; Pennsylvania and New York were outliers.[105] The Commissioners adopted the

---

[102] George M. Stroud, *A Digest of the Laws of Pennsylvania* 845 (6th ed. 1841) (emphasis added). The Pennsylvania statute also permitted a limited partner to transfer their interests before death: "[A] special partner, with the assent of his partner, in writing, first had and obtained, may sell or assign his interest in a limited partnership without causing thereby a dissolution of the partnership." *Id.*

[103] *See, e.g., Bunting v. Bunting*, 48 A. 681 (Pa. 1901).

[104]*See Walkenshaw v. Perzel*, 32 How. Pr. 233, 239 (N.Y. Sup. Ct. 1866); 1 John W. Edmonds, *Statutes at Large of the State of New York*, pt. II, ch. IV, tit. I, § 12 (2d. ed. 1869); Edmonds, *supra*, § 12.

[105] *See* Eugene A. Gilmore, *Handbook on the Law of Partnerships* 638 (1911); *id.* at 638–39 ("Some statutes, however, contain provisions affecting [the majority] rule. . . . In Minnesota the certificate may provide that the death of a partner shall not dissolve the partnership, in which case it may be continued by the surviving partners as a limited partnership till the expiration of the period fixed. In New York the business may be continued if the partnership articles so provide and the deceased partner's representatives consent. . . . In Virginia a partnership is not dissolved by

minority approach. For general partners, ULPA provided that "[t]he retirement, death or insanity of a general partner dissolves the partnership, unless the business is continued by the remaining general partners (a) Under a right so to do stated in the certificate, or (b) With the consent of all members."[106] For limited partners, ULPA provided as follows: "On the death of a limited partner his executor or administrator shall have all the rights of a limited partner for the purpose of settling his estate, and such power as the deceased had to constitute his assignee a substituted limited partner."[107] That language anticipates the current content of Sections 17-705 and 18-705, but it only applies to limited partners.

Delaware was the last state to adopt ULPA.[108] Nearly sixty years after its promulgation, in 1973, the General Assembly adopted the Delaware Uniform Limited

---

the death of one or more special partners, unless it is expressly stated in the certificate or 'paper.'").

[106] ULPA § 20 (1916).

[107] *Id.* § 21.

[108] *See generally* Joseph J. Basile, Jr., *The 1985 Delaware Revised Uniform Limited Partnership Act*, 41 Bus. Law. 571, 571–73 (1986); *accord* Stephen I. Glover & Craig M. Wasserman, *Partnerships, Joint Ventures & Strategic Alliances* § 12.02, at 12-7 (2003); *see* Basile, *supra*, at 571 ("All states except Louisiana ultimately did adopt the ULPA. Delaware was the last to do so, waiting until 1973. [DULPA] contained a number of nonuniform provisions, however, that made Delaware an attractive jurisdiction in which to organize limited partnerships." (footnote omitted)).

Partnership Act ("DULPA"). Delaware's version copied ULPA's provisions for what happened upon a limited partner's death and the rights of the estate.[109]

### c.  The Revised Uniform Limited Partnership Act

In 1976, just three years after Delaware adopted DULPA, the Commissioners promulgated the Revised Uniform Limited Partnership Act ("RULPA"). The new statute provided that the death of a general partner who was an individual caused the general partner to withdraw from the limited partnership,[110] but the withdrawal of a general partner (including by reason of death) would not cause dissolution if at least one other general partner remained and the limited partnership agreement authorized the limited partnership to continue.[111]

RULPA also included an antecedent to Sections 17-705 and 18-705. It stated:

> If a partner who is an individual dies or a court of competent jurisdiction adjudges him [or her] to be incompetent to manage his [or her] person or his [or her] property, the partner's executor, administrator, guardian, conservator, or other legal representative may exercise all of the partner's rights for the purpose of settling his [or her] estate or administering his [or her] property, including any power the partner had to give an assignee the right to become a limited partner. If a partner is a corporation, trust, or other entity and is dissolved or terminated, the powers of that partner may be exercised by its legal representative or successor.[112]

---

[109] *Compare* 6 *Del. C.* § 1721 (1973), *with* ULPA § 21 (1916) (identical text).

[110] RULPA § 402(6)(i).

[111] RULPA § 801(4).

[112] 6 *Del. C.* § 17-705 (1981) (bracketed language in original).

Notably, RULPA departed from ULPA by addressing the death or incapacity of any partner, not just a limited partner. By making this change RULPA opened the door to a personal representative of a general partner exercising general-partner-level governance rights "for the purpose of settling his [or her] estate or administering his [or her] property." At the same time, however, RULPA provided expressly that the rights a personal representative could exercise only included "any power the partner had to give an assignee the right to become a limited partner," not a general partner. Commentators cited the change but did not provide a rationale.[113]

---

[113] *See* Lubaroff & Altman, *supra*, § 5.11, at 5-43 ("Section 17-705 makes it clear that a limited partner who dies or becomes adjudicated as incompetent to manage his or her person or property, does not lose all rights and powers by virtue of such death or incompetence, but rather, such limited partner's personal representative can exercise the rights and powers of such deceased or incompetent limited partner and such personal representative can even exercise a power under a partnership agreement to become a limited partner."); 1 Larry E. Ribstein & Robert R. Keatinge, *Ribstein and Keatinge on Limited Liability Companies* § 9:9 (2024), Westlaw (database updated June 2024) ("The RULPA provides that an executor who succeeds to the rights of a deceased or incompetent partner may exercise all of the partner's rights to settle the partner's estate or administer the partner's property. This implies that the executor may not be an assignee of the partner, although it is not clear why the successor should not obtain the former partner's financial rights. The same rules on these matters apply to LLCs.") (footnote omitted); Robert R. Keatinge & Ann E. Conaway, *Keatinge and Conaway on Choice of Business Entity: Selecting Form and Structure For a Closely Held Business* § 5.21, Westlaw (database updated Oct. 2023) ("Under RULPA, the death of a general partner is an event of withdrawal entitling the general partner's executor or administrator to assume the powers of the deceased partner for the purpose of settling the partner's estate. As the deceased partner's death is deemed an event of withdrawal, the legal representative is entitled to pursue a determination of the fair value of the deceased partner's interest in the partnership as of the date of death based upon the partner's right to share in distributions from the partnership. The event of withdrawal may cause dissolution of the partnership.") (footnotes omitted)).

This time, Delaware moved more quickly. In 1982, the General Assembly adopted the Delaware Revised Uniform Limited Partnership Act ("DRULPA"). Section 17-705 tracked RULPA's model provision and had the same implications.[114]

In 1985, Delaware struck out on its own. In that year, the General Assembly made a series of significant changes to DRULPA. Those changes did not affect Section 17-705, which continued to track the provision in the model act.

### d. The LLC Act

That brings us to 1992, when the General Assembly adopted the LLC Act. The 1992 version of Section 18-705 closely tracked the LP Act version. It stated:

> If a member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the member's executor, administrator, guardian, conservator or other legal representative may exercise all of the member's rights for the purpose of settling his estate or administering his property, including any power under a limited liability company agreement of an assignee to become a member. If a member is a corporation, trust or other entity and is dissolved or terminated, the powers of that member may be exercised by its legal representative or successor.[115]

Like its LP Act forebear, which applied to any partner, Section 18-705 applied to any member. Unlike the LP Act, which spoke in terms of a personal representative executing any power to make an assignee a limited partner, the LLC Act spoke generally about a right to become "a member."

---

[114] 6 *Del. C.* § 17-705 (1982).

[115] 6 *Del. C.* § 18-705 (1992).

Since 1992, Section 18-705 has persisted largely unchanged. In 1995, the General Assembly amended the provision to eliminate gendered language.[116] And in 2016, the statute was amended to delete the words "executor, administrator, guardian, conservator or other legal representative" from the first sentence and substitute "personal representative," as well as to delete the words "legal representative or successor" from the last sentence and substitute "personal representative."[117] In lieu of this language, the amendment added a new definition of "personal representative" to the definitions section.[118]

Looking back from the original limited partnership statues to what Section 18-705 says today reveals a steady broadening of the scenarios where a personal representative could exercise rights. The ancestral provisions only authorized an executor of a limited partner interest to exercise the rights that a limited partner would have had for purposes of settling the estate. The Commissioners broadened that to any partner in RULPA, and Delaware followed suit. Then, when enacting the LLC Act, the General Assembly substituted the concept of a member, without limiting the concept to non-managing members or any other more limited type of interest.

The statutory progression reinforces a plain language reading under which Section 18-705 authorizes a personal representative to exercise full governance rights

---

[116] 70 Del. Laws, ch. 186, § 1 (1995).

[117] 71 Del. Laws, ch. 77, § 29 (2016).

[118] *Id.*

58

for a proper purpose, at the expense of the pick-your-partner principle. In the face of that history and the explicit language of Section 18-705, the pick-your-partner principle cannot prevail.

### e. A Contrast: The Uniform Limited Partnership Act of 2001

Although the Delaware versions of Sections 17-705 and 18-705 have not changed since 1992, the Commissioners have continued their work. In 2001, they introduced a new version of the Uniform Limited Partnership Act that dramatically restricted the powers of the executor of a deceased partner, consistent with the pick-your-partner principle. The new provision states:

> If a partner dies, the deceased partner's legal representative may exercise the rights of a transferee provided in Section 702(c); and for the purposes of settling the estate, the rights of a current limited partner under Section 304.[119]

The commentary explains that the section limits the executor's rights to those of a transferee, plus "temporary, additional information rights to the legal representative of the estate."[120] The provision does not contemplate that the executor can exercise any governance rights.

The Commissioners also have promulgated a revised version of Limited Liability Company Act. Section 504 addresses the power of the legal representative of a deceased member, stating:

---

[119] ULPA (2001 with amendments through 2013) § 704.

[120] *Id.* comment.

59

If a member dies, the deceased member's legal representative may exercise:

(1) the rights of a transferee provided in Section 502(c); and

(2) for the purposes of settling the estate, the rights the deceased member had under Section 410.[121]

The commentary states: "The estate and those claiming through the estate are transferees, and as such they have very limited rights to information. This section provides temporary, additional information rights to the legal representative of the estate. Sections 410 and 502(c) pertain only to information rights."[122]

Both provisions comport with the pick-your-partner principle and illustrate an alternative tack that a statutory regime could take. The Delaware General Assembly has not adopted either model. The decision to retain Section 18-705 and its LP Act counterpart reinforces the implication that an executor can exercise all of the powers of a member (or a partner) for the purpose of settling the deceased member's estate and administering its property.

\* \* \*

To the extent that Section 18-705 stands in tension with the pick-your-partner principle, the language of the statute controls. A personal representative can exercise the governance rights that a member possessed, as long as the personal representative acts for a proper purpose.

---

[121] ULLCA (2006 with amendments through 2013) § 504.

[122] *Id.* § 504, comment.

### 3. Whether The Right Must Be "Necessary" For Settling The Estate Or Administering Property

In her final effort to limit the scope of Steven's rights, Jane argues that Steven can only exercise governance rights that are *necessary* for settling an estate. That requirement does not appear anywhere in Section 18-705. The statute instead requires that Steven exercise any governance rights for a proper purpose, defined as the settlement of the estate or the administration of property.

Other Delaware doctrines require that a party exercise a particular right or power for a proper purpose. A stockholder exercising Section 220 rights must do so for a purpose reasonably related to the stockholder's status as a stockholder, and the stockholder must both identify a legitimate purpose and pursue that purpose subjectively.[123] Fiduciaries also must exercise their powers for a proper purpose, namely the best interests of the beneficiary. A fiduciary must both identify how the

---

[123] *See* 8 *Del. C.* § 220 ("Any stockholder . . . shall, upon written demand under oath stating the purpose thereof, have the right . . . to inspect for any proper purpose . . ."); *id.* ("A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder."); *AmerisourceBergen Corp. v. Lebanon Cty. Emps.' Ret. Fund*, 243 A.3d 417, 425 (Del. 2020) ("A proper purpose is a purpose reasonably related to such person's interest as a stockholder." (cleaned up)); *Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 889 (Del. Ch. 2020) (noting that after "plaintiff establishes (i) its status as a stockholder, (ii) its compliance with the statutory requirements for making a demand, and (iii) a proper purpose for conducting the inspection, . . . . the plaintiff must demonstrate by a preponderance of the evidence that 'each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection.'") (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)); *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156 (Del. Ch. 2006) ("All of [the elements of Section 220] are underlined by a clear requirement that a Section 220 plaintiff has a responsibility to make its demand in good faith . . . ."), *aff'd*, 922 A.2d 415 (Del. 2007).

fiduciary act benefits the beneficiary and pursue that purpose in subjective good faith.[124]

The same is true for Steven as executor. He must subjectively believe that his exercise of governance rights serves a proper purpose, and his belief must be rational. As long as that is the case, the court will not second-guess Steven's exercise of governance rights.

More than that, this decision cannot say. The parties have joined issue over a series of declaratory judgments. No one has identified a particular action that Steven seeks to take or which gives rise to a concrete dispute necessitating analysis of whether Steven had a proper purpose for seeking to invoke a membership-level governance right. If a dispute arises and the parties cannot resolve it, then litigation may be warranted. At present, any opinion about whether or not Steven could take a specific act would be advisory.

---

[124] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 455 (Del. Ch. 2023) ("Acting loyally requires acting in good faith, and acting in good faith requires that the fiduciary subjectively believe that the course of action is in the best interests of the corporation and its stockholders."); *id.* ("Stated conversely, a corporate fiduciary acts in bad faith when the fiduciary 'intentionally acts with a purpose other than that of advancing the best interests of the corporation.'") (citation omitted)). *See also United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 895 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021) ("As long as an otherwise independent and disinterested director has a rational basis for her belief, that director is entitled (indeed obligated) to make decisions in good faith based on what she subjectively believes will maximize the long-term value of the corporation for the ultimate benefit of its residual claimants.").

### D. The Affirmative Defenses

Jane asserted the equitable defenses of acquiescence, ratification, estoppel, laches, consent, and waiver to block the plaintiffs from obtaining any of relief. In the current case, each of those defenses reduces to the contention that everyone knew that she, Allan, and Louisa were managing the Goldman family real estate business, and no one challenged that reality until this lawsuit. Therefore, Jane says, Steven should not be able to challenge her managerial role or assert the governance rights associated with Allan's interest.

Each of Jane's affirmative defenses requires that the plaintiffs have known about Jane's actions and yet waited too long to assert a claim.[125] Laches advances the

---

[125] *See, e.g.*, *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013) (the doctrine of acquiescence "applies when a plaintiff 'has full knowledge of his rights and the material facts'") (citation omitted), *aff'd*, 106 A.3d 1035 (Del. 2014); *Wechsler v. Abramowitz*, 1984 WL 8244, at *4 (Del. Ch. Aug. 30, 1984) ("[K]nowledge of all the facts is an essential element of acquiescence" and courts will deny the affirmative defense where a plaintiff "did not have knowledge of the correct and complete facts."); *TR Invs., LLC v. Genger*, 2010 WL 2901704, at *16 n.113 (Del. Ch. July 23, 2010) ("Before a party can ratify something, it must first have 'sufficient notice or means of knowledge' of the . . . act in question." (citation omitted)), *aff'd*, 26 A.3d 180 (Del. 2011); *Olson v. Halvorsen*, 2009 WL 1317148, at *11 (Del. Ch. May 13, 2009) ("'[T]he party to be estopped'" must possess "'knowledge, actual or constructive, of the real facts.'" (citation omitted)), *aff'd*, 986 A.2d 1150 (Del. 2009);[125] *Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) ("'Waiver is the voluntary and intentional relinquishment of a known right' and therefore 'implies knowledge of all material facts.'" (citation omitted)). The estoppel defense fails for similar reasons. Jane cannot identify any representation by the plaintiffs to the effect that she would be the manager of SG Windsor in the sense contemplated by the LLC Act. *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 119 (Del. Ch. 2015) ("[E]stoppel requires some form of representation (or promise) plus prejudicial reliance."), *rev'd on other grounds*, 152 A.3d 1248 (Del. 2016).

waited-too-long argument directly. Acquiescence, ratification, consent, and waiver treat a long delay as implied consent. Estoppel treats the long delay as an implied representation on which Jane relied.

Jane is right in one respect. Everyone knew that she, Allan, and Louisa were managing the Goldman family real estate business. But as discussed previously, they were managing the business in the colloquial sense.

That longstanding *status quo* did not provide any reason to think that Jane, Allan, and Louisa saw themselves as managers of SG Windsor for purposes of the LLC Act. The dispute over SG Windsor did not become known, concrete, or ripe until 2022, when Allan died and Steven attempted to exercise the governance rights Allan possessed as a member.

Once that dispute arose, Amy and Steven sued promptly. They did not acquiesce to Jane's provision. They did not waive any right contest Jane's claim to be an LLC Act manager. Nor did they acquiesce in, consent to, or ratify her status. None of her defenses prevent the plaintiffs from seeking relief.

## E. No Injunctive Relief

The plaintiffs ask the court to enter an injunction preventing Jane from taking any action unilaterally on behalf of SG Windsor. The plaintiffs correctly observe that because SG Windsor is a member-managed LLC, and because SG Windsor lacks any LLC agreement that says otherwise, the management of SG Windsor is "vested in its members in proportion to the then current percentage or other interest of members in the profits of the limited liability company owned by all of the members, the

64

decision of members owning more than 50 percent of the said percentage or other interest in the profits controlling . . . ."[126]

At present, however, there is no concrete act that the plaintiffs seek to enjoin. Under Court of Chancery Rule 65, "every order granting an injunction . . . shall be specific in its terms; shall describe in reasonable detail, and not by reference to the complaint or other document unless such document is served with the injunction or restraining order, the act or acts to be restrained . . . ."[127] The plaintiffs have not identified concrete relief that the court could award, because Jane is not currently threatening any particular action. The plaintiffs instead seek injunctive relief as if it were the natural consequence of a declaratory judgment. It is not.

### III. CONCLUSION

Allan's estate holds an assignee interest, not a member interest. As Allan's executor, Steven can exercise the member-level governance rights that Allen possessed while alive, but only for the proper purposes of settling the estate or administering its affairs. He cannot exercise member-level governance rights for any other reason. Except for those proper purposes, the estate has only the rights of an assignee. Jane's affirmative defenses fail, and no injunction will issue.

The parties will cooperate on preparing a form of final order. If there are additional issues that the court must resolve before an order can be entered brining

---

[126] 6 *Del. C.* § 18-402.

[127] Ct. Ch. R. 65(d).

65

this dispute to a close at the trial court level, then the parties will submit a joint letter identifying those issues and a schedule for resolving them.